EVANSTON INSURANCE COMPANY,       )
                                  )
    Plaintiff,                    )
                                  )
v.                                )    CASE NO. CV413-136
                                  )
WILLIAM MELLORS; JOEY HERREN and  )
SHARON HERREN; GREGORY PAUL       )
SUCHER; NONSTOP FITNESS, INC.;    )
CLUB MANAGEMENT SERVICES, INC.,   )
f/k/a Nonstop Fitness, Inc.;      )
CURTIS HUFFMAN; LIKEN             )
ENTERPRISES d/b/a Active          )
Nutrition Corporation; and        )
BARRIN INNOVATIONS, LLC;          )
                                  )
    Defendants.                   )
_____)

## O R D E R

Before the Court is Plaintiff's Motion for Summary Judgment
(Doc. 71) to which Defendants Joey Herren, Sharon Herren,
William Mellors and Curtis Huffman filed responses (Doc. 81;
Doc. 84; Doc. 85). For the following reasons, Plaintiff's motion
is **DENIED**. This case will proceed to trial.

### BACKGROUND

This case arises out of a dispute regarding the insurance
coverage offered by Plaintiff Evanston Insurance Company to June
& Johnny, LLC ("J&J" or "insured"), a mixer and seller of
athletic supplements. One of the supplements, RAGE, is alleged
to have caused a stroke that Mr. Herren suffered in August,

2009. (Doc. 71 at 12.) Plaintiff is currently seeking a declaratory judgment from this Court that it is not obligated to defend William Mellors, a purported owner and manager of J&J, from the claims brought against him by the Herren's. (Doc. 67.)

Mr. Mellors has a history of involvement in the mixing, development, and sale of athletic supplements. In 2007, Mr. Mellors was engaged in a partnership known as S&W Enterprises, which worked with Liken Enterprises d/b/a Active Nutrition Company ("ANC") to manufacture and sell supplements. (Doc. 81 at 2.) S&W later acquired possession of mixing equipment owned by another company named Barrin Innovations, LLC. (Id. at 2-3.) Around February 23, 2009, Mr. Mellors gave notice that he was dissolving S&W's partnership, although he continued operating S&W as usual. (Id. at 3.) In February 2009, J&J was registered with its listed owner as Shala Stephenson, Mr. Mellors's wife. While Mrs. Stephenson is listed as J&J owner, there is some dispute as to her actual role in the company. (Doc. 71 at 4; Doc. 81 at 4.) On February 25, 2009, Mr. Mellors purchased[1] the assets Mr. Barnard owned in both Rockhard Formulations, LLC and Barrin Innovations, LLC. (Doc. 71, Attach. 4 at 2; Doc. 81 at 3.) The purchase agreement required the buyer to indemnify the seller from any liability "arising from the actions of the

---

[1] The purchase agreement defines Mr. Mellors as the owner of SWE, LLC. J&J often did business as SWE, LLC.

business including but not limited to liabilities incurred, outstanding debts, harm caused by products and/or machinery owned or produced by the businesses." (Doc. 71, Attach. 4 at 3.) Among the products that Barrin blended was RAGE. After this purchase, J&J began blending RAGE independently. (Doc. 81 at 4.)

As early as 2008, the Drug Enforcement Agency ("DEA") began receiving public comments about whether a RAGE ingredient, Phera-Plex, should be classified as a controlled substance. (Doc. 71, Attach. 3 at 40.) At that time, Mr. Mellors was aware that the DEA was asking for these comments. (Id.) As part of an ongoing criminal investigation the Food and Drug Administration ("FDA") conducted a September 24, 2009 raid of a Bodybuilding.com[2] warehouse that contained RAGE products. (Id. at 16.) Among the ingredients targeted was Phera-Plex.[3] (Doc. 71, Attach. 6.) At that time, the FDA notified Bodybuilding.com that the ingredients were or should be classified as steroids. (Id.) Mr. Mellors knew of the raid when it occurred, and in 2011 learned that RAGE contained one or more of the ingredients targeted by the FDA. (Doc. 71, Attach. 3 at 16-17.) On January 4, 2010, the FDA banned Phera-Plex. (Id. at 31, 34, 35.) J&J did not sell RAGE after the ban. (Id.)

---

[2] Bodybuilding.com was an online retailer of RAGE.
[3] Phera-Plex is also known as "Madol." (Doc. 71, Attach. 3 at 31.)

On March 23, 2009, J&J applied for insurance with Plaintiff. (Doc. 71, Attach. 7.) Mr. Mellors signed the application stating that he was the president of J&J. (Id.) Mr. Mellors also stated that J&J had been in business for one year. (Id.) A conditional quote was issued, and Plaintiff received a final typed application on July 8, 2009. (Doc. 71, Attach. 8.) Plaintiff received a renewal application on May 11, 2010. (Doc. 71, Attach. 9.) Both of these applications were incomplete as Mr. Mellors had failed to answer several questions. (Doc. 81 at 9.) There is no evidence that the Plaintiff sought a complete application before issuing these insurance policies.

In August 2009, Mr. Herren suffered a stroke after taking RAGE. There is a dispute as to when the RAGE Mr. Herren took was compounded. Plaintiff argues that the RAGE was blended in 2008, prior to J&J's existence. (Doc. 71, Attach. 22, 23 (showing lot #BI01-054 sold to ANC on 5/72008 and 10/31/2008).) Defendants maintain that these purchasing orders may have been doctored. (Doc. 71, Attach. 3 at 33.)

In May 2011 Mr. Mellors sent Plaintiff another incomplete renewal application for insurance, which is the subject of the current dispute. Like the previous applications, this renewal application was incomplete. However, this time Plaintiff conditionally issued the policy pending a complete application. (Doc. 71, Attach. 11.) On June 13, 2011 Plaintiff threatened the

4

cancelation of the policy if Plaintiff did not receive a complete application from J&J. (Doc. 71, Attach. 12.) A completed application was received on June 13, 2011. (Doc. 71, Attach. 13.) The application included three questions that were answered in the negative by Mr. Mellors. The first was "[i]s (are) any person(s) or organization(s) proposed for this insurance aware of any fact, incident, circumstance, situation, condition, defect or suspected defect which may result in a Product Liability claim, such that would fall under the proposed insurance." (Doc. 71, Attach. 14 at 12) The second asked if "[d]o any products or ingredients or components thereof, originate from outside the United States." (Id. at 11.) The third inquired whether "any of the Applicant's products or ingredients or components thereof, ever been the subject of any investigation, enforcement action, or notice of violation of any kind by any governmental, quasi-governmental, administrative, regulatory or oversight body" (Id.)

The application also stated that

> [n]o fact, incident, circumstance, situation, condition, defect or suspected defect indicating the probability of a claim or action for which coverage may be afforded by the proposed insurance is now known by any person(s) or organization(s) proposed for this Insurance other than that which is disclosed in this application. It is agreed by all concerned that if there is knowledge of any such fact, incident, circumstance, situation, condition, defect or suspected defect any claim subsequently emanating

5

therefrom shall be excluded from coverage under the proposed insurance.

(Id. at 12.) After receiving the completed application, Plaintiff issued the policy providing coverage for any claim brought between May 15, 2011 and May 15, 2012, so long as the occurrence giving rise to the claim occurred on or after the retroactive date of May 12, 2009. (Id. at 14.)

Following the stroke, the Herren's filed a number of complaints in an effort to recover damages, finally naming SWE and others in a Second Amended and Recast Complaint. (Doc. 67 ¶ 21.) Plaintiff agreed to provide Mr. Mellors with a defense to the underlying action subject to a reservation of rights. (Id. at ¶ 3.)

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

6

U.S. 574, 587 (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the

7

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

II.  CHOICE OF LAW

Plaintiff asserts, and Defendants have not disagreed, that for purposes of this dispute, Texas law will apply to the issue of misrepresentation in an insurance application, while Georgia law will apply to all other issues including who and what is insured under the contract, and which policy exclusions apply. (Doc. 71 at 14-15.)

III. MOTION FOR SUMMARY JUDGMENT

A.  Rage As A Covered Product Under the Policy

Plaintiff first argues that the policy does not cover claims arising out of Mr. Herren's use of RAGE because liability under the policy only applies to "dietary supplements". (Doc. 71 at 2; Doc. 71, Attach. 14 at 14.) Plaintiff reasons that because the RAGE ingredient Phera-Plex was banned in January of 2010, prior to issuance of the current insurance policy, RAGE cannot

be labeled as a dietary supplement. (Doc. 88 at 9.) As a result, Plaintiff maintains that it is not required to defend Mr. Mellors because the Herren's claim arises from the use of a non-covered product. Defendants argue that because RAGE did not become a controlled substance until after Mr. Herren suffered his stroke in January of 2010, RAGE is subject to coverage under the policy because it was a "dietary supplement" at the time of its sale and use. (Doc. 81 at 17.)

"When a contract is unambiguous and capable of only one reasonable interpretation, it is a matter for the court." Roland v. Ga. Farm Bureau Mut. Ins. Co., 265 Ga. 776, 777, 462 S.E.2d 623, 625 (1995). When this occurs, a policy's "plain terms must be given full effect even though they are beneficial to the insurer and detrimental to the insured." Sermi Prods., Inc. v. Ins. Co. of Penn., 201 Ga. App. 414, 415, 411 S.E.2d 305, 306 (1991) (citing Woodmen of the World Life Ins. Soc'y v. Etheridge, 223 Ga. 231, 235, 154 S.E.2d 369, 372 (1967)). However, insurance policies "are to be construed strictly in favor of the insured and against the insurer." Sovereign Camp, W.O.W. v. Heflin, 188 Ga. 234, 234, 3 S.E.2d 559, 560 (1939).

In this case, the policy states that "the coverage afforded by this policy is limited to liability for only those Claims that are first made against the Insured during the Policy Period, or the Extended Reporting Period." (Doc. 71, Attach. 14

at 14.) The policy includes a Retroactive Date of May 12, 2009 allowing recovery for claims made during the Policy Period if "the entirety of [the] bodily injury or property damage and occurrence happens . . . on or after the Retroactive Date." (Id. at 14, 27.) In this case, the bodily injury happened on September 29, 2009, within the Retroactive Date of the policy, and the claim was made during the Policy Period. As a result, at least to timing, Mr. Herren's lawsuit falls within the policy.

It also appears that RAGE was considered a dietary supplement at the time of Mr. Herren's August 2009 stroke. For example, during a November 3, 2009 voluntary recall Bodybuilding.com placed a notification on the FDA's website classifying the recalled items, including RAGE, as "dietary supplement[s]." (Doc. 71, Attach. 6 at 2.) Nor was the RAGE ingredient Phera-Plex subject to an FDA ban when Mr. Herren used it. What is left then, is to determine whether the policy excludes from coverage claims for injury caused by dietary supplements where those supplements were subsequently banned by the FDA.

Plaintiff's policy is governed by multiple exclusions. These exclusions includes prohibitions for coverage on claims relating to mold (Doc. 71, Attach. 14 at 17), asbestos (id. at 18), terrorism (id. at 19), and certain ingredients (id. at 24). However, Plaintiff did not exclude former nutrition supplements

that had subsequently been banned or include a definition for the term "dietary supplement." While Plaintiff may have intended for the policy to cover only products that were legal at the time the insurance contract was made, there is no evidence pointing to such an exclusion. That Plaintiff failed to include such an exclusion, to its detriment, is not a sufficient reason to deny coverage.

Mr. Herren's claim was made during the policy period, and his stroke occurred in 2009, within the retroactive period. The evidence indicates that RAGE was considered a dietary supplement at the time Mr. Herren suffered his stroke. A plain reading of the policy finds that it includes coverage for claims made during the policy period, with the underlying occurrence for the claim occurring during the retroactive period, and involving dietary supplements. Such an event occurred here. As a result, Plaintiff's Motion for Summary Judgment with respect to whether RAGE is a covered product is denied.

B.    Mellors As An Insured

Plaintiff next alleges that Plaintiff is not required to provide coverage because Mr. Mellors is not an "insured" under the Policy. (Doc. 71 at 16-17.) Plaintiff notes that the term "insured" under the contract is defined as,

    the limited liability company so named, any manager
    thereof, but only with respect to their duties as
    manager of the limited liability company and any

member thereof, but only with respect to the conduct
of the business of the limited liability company.

(Doc. 71, Attach. 14 at 26.) The policy named June and Johnny, LLC, as the named insured. (Doc. 71 at 17; Doc. 71, Attach. 14 at 14.) Plaintiff argues that because Mr. Mellors did not hold any official title with the named insured, he was at best an agent of the insured.[4] (Doc. 71 at 17.) Plaintiff also notes that Mr. Mellors "self-assigned all titles of 'owner' and 'president' in the Insured's applications." (Doc. 71, Attach. 3 at 26; Doc. 88 at 12.)

Defendants disagree. They cite to a document written by Mr. Mellors's wife that states "I Shala Stephenson owner of June & Johnny LLC (dba SWE) through this document allow William Mellors to handle all business matters concerning June & Johnny LLC, (dba SWE) from this point forward." (Doc. 71, Attach. 5 at 2.) Defendants allege that this document designated Mr. Mellors as manager of J&J. (Doc. 81 at 20.)

---

[4] Plaintiff goes on to argue that M.E.N. Technologies, LLC is not an insured and that the Vendors Endorsement in the Policy does not cover Mr. Mellors. As Defendants did not respond to these arguments, any defenses are waived. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."); see also Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009) (per curiam) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal.").

12

Defendants have put forward no evidence that Mr. Mellors is a "member" of J&J beyond the bald assertion that Mr. Mellors identified himself as the "owner". Nothing currently in evidence shows that Mr. Mellors was admitted as a member of J&J at the time of its formation, or that his membership was otherwise reflected in J&J's business records. O.C.G.A. § 14-11-505; accord. Tex. Bus. Orgs. Code Ann. § 101.103. Furthermore, Mr. Mellors admitted that all titles he used were "self-assigned." (Doc. 71, Attach. 3 at 26.) It is evident then that Mr. Mellors is not granted coverage under the policy by virtue of being a member.

What is left is an evaluation of whether Mr. Mellors was a "manger" of J&J based on his wife's delegation of authority, or whether the same delegation merely made Mr. Mellors an agent. The Texas Business Organizations Code defines manager as "a person designated as a manager of a limited liability company that is not managed by the members of the company." § 1.002(51). Similarly, under Georgia law a manager is "a person in whom management is vested in accordance with subsection (b) of [O.C.G.A. § 14-11-304]." O.C.G.A. § 14-11-101(15). Georgia law provides that, unless otherwise stated in the articles of organization or a written operating agreement[5], a manager

---

[5] Both parties neither argue that J&J is not a manager-managed LLC nor put forth evidence of an operating agreement. Had either

(1) [s]hall be designated, appointed, elected, removed, or replaced by the approval of more than one half by number of the members;

(2) [n]eed not be members of the limited liability company or natural persons; and

(3) [u]nless they have been earlier removed or have earlier resigned, shall hold office until their successors shall have been elected and qualified.

O.C.G.A. § 14-11-304(b). In Georgia, "[m]embers of an LLC are statutorily empowered to make all decisions in managing the LLC subject to the operating agreement." In re Global Ship Sys., LLC, 391 B.R. 193, 204 (Bankr. S.D. Ga. 2007) (emphasis in original) (citing O.C.G.A. § 14-11-304(a)).

It is evident that under both of these statutory provisions, Mr. Mellors qualifies as a manager of J&J. He was designated by his wife, the sole member of the LLC (Doc. 71 at 3) as an individual entitled to handle "all business matters" (Doc. 71, Attach. 5 at 2). Plaintiff has not provided any evidence that Mr. Mellors was removed from his position. As a result, Mr. Mellors fulfills the predicate requirements of a "manager" according to both Georgia and Texas law. See, e.g.,

_____

party made such an argument the outcome may have been different, as requirements imposed by LLC operating agreements define the terms of management. Denim N. Am. Holdings, LLC v. Swift Textiles, LLC, 532 F. App'x. 853, 863 (11th Cir. 2013). As a result, this Court is unable to determine whether the operating agreement, or other appropriate documentation, barred the members from appointing non-member managers, or whether Ms. Stephenson's method of appointing a manager was appropriate. In any event, the argument is waived due to the failure of either party to raise this issue.

14

Inland Atl. Old Nat. Phase I, LLC v. 6425 Old Nat., LLC, 329 Ga. App. 671, 675, 766 S.E.2d 86, 91 (2014) (holding a member could be a manager even where "not expressly defined as a manager under the Joint Venture agreement"); see contra Zeising v. Shelton, 2014 WL 3571276, *6 (W.D. La. July 18, 2014) (holding because designation was oral, "designation of manager status is without effect since Georgia law clearly insists that an LLC identify any members and managers in writing"). Plaintiff's argument that Mr. Mellors is not an "employee" of J&J, is likewise unavailing as there is no statutory requirement that a manager also receive a salary. As a result, Plaintiff's motion for summary judgment based on Mr. Mellors not being a covered individual under the policy is denied.

C.   Material Misrepresentation

Plaintiff next argues that misrepresentations in the insurance application bar coverage. (Doc. 71 at 19.) Plaintiff alleges that the insured misrepresented three facts in its application. First, Plaintiff alleges that the insured made a material misrepresentation when it answered no to the question asking whether "any of the Applicant's products or ingredients or components thereof, ever been the subject of any investigation, enforcement action, or notice of violation of any kind by any governmental, quasi-governmental, administrative, regulatory or oversight body." (Doc. 71, Attach. 14 at 11.)

15

Second, Plaintiff contends that the insured made a material misrepresentation when it answered no to the question of whether there was "any person(s) or organization(s) proposed for this insurance aware of any fact, incident, circumstance, situation, condition, defect or suspected defect which may result in a Product Liability claim, such that would fall under this proposed insurance." (Id. at 12.) Finally, Plaintiff maintains that the insured made a material misrepresentation when it answered no to the question of whether "any products or ingredients or components thereof, originate from outside the United States." (Id. at 11.)

A Texas statute governs whether a false statement in an insurance policy can make the policy void or voidable. Tex. Ins. Code Ann. § 705.003.[6] For an insurer to void a policy under this

___

[6] According to Tex. Ins. Code. Ann. § 705.003,
> (a) An insurance policy provision that states that a misrepresentation, including a false statement, made in a proof of loss or death makes the policy void or voidable:
> > (1) has no effect; and
> > (2) is not a defense in a suit brought on the policy.
> (b) Subsection (a) does not apply if it is shown at trial that the misrepresentation:
> > (1) was fraudulently made;
> > (2) misrepresented a fact material to the question of the insurer's liability under the policy; and
> > (3) misled the insurer and caused the insurer to waive or lose a valid defense to the policy.

statute, the following five elements must be pled and proved: "(1) the making of the representation; (2) the falsity of the representation; (3) reliance thereon by the insurer; (4) the intent to deceive on the part of the insured in making same; and (5) the materiality of the representation." Mayes v. Mass. Mut. Life Ins. Co., 608 S.W.2d 612, 616 (Tex. 1980)

Where "an application for insurance is attached to and made a part of the policy and is accepted and retained by the insured, the insured is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein." Odom v. Ins. Co. of State of Pa., 455 S.W.2d 195, 199 (Tex. 1970). Where application terms are at issue, however, it is necessary to make a determination of whether the insured had the necessary intent to deceive. Washington v. Reliable Life Ins. Co., 581 S.W.2d 153, 160 (Tex. 1979). As a result, "false statements which are made negligently, carelessly or by mistake are not sufficient to avoid a[n] . . . insurance policy where the defense is based upon the insured's misrepresentation of a material fact." Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 892 (5th Cir. 1991) (citing Soto v. S. Life & Health Ins. Co., 776 S.W.2d 752, 756 (Tex. App. 1989)). Furthermore, a misrepresentation is not shown by proving that the applicant "should have known" of the falsity of the representation. Allen v. Am. Nat. Ins. Co., 380 S.W.2d 604, 608 (Tex. 1964).

Nevertheless, it is possible to prove intent to deceive with circumstantial evidence. Sharp v. Lincoln Am. Life Ins. Co., 752 S.W.2d 673, 676 (Tex. App. 1988).

When assessing the materiality of the misrepresentation it is not enough for the insurance company to state that it would have charged a higher premium for the policy if it had known the truth. A misrepresentation is only material if "it actually induced the insurance company to assume the risk." Harrington v. Aetna Cas. & Sur. Co., 489 S.W.2d 171, 177-78 (Tex. Civ. App. 1972); (see also Horne v. Charter Nat. Ins. Co., 614 S.W.2d 182, 185 (Tex. Civ. App. 1981) (holding that court could not conclude "as a matter of law" misrepresentation was material to risk because insurance company represented it "would have charged a higher premium to bind the coverage")). Likewise, "only the insurer's actual knowledge of the misrepresentation[] [will] [] destroy[] its defense of fraud." Koral Indus. v. Sec.-Conn. Life Ins. Co., 802 S.W.2d 650, 651 (Tex. 1990).

The record in this case fails to establish that any misrepresentation[7] was material. Plaintiff stated in its Motion

---

[7] This Court is inclined to agree that the insured engaged in willful misrepresentations to Plaintiff as to the investigation by a governmental body. Mr. Mellors, who signed the insurance application on behalf of the insured, stated that he knew the FDA banned a RAGE ingredient in January 2010. (Doc. 71, Attach. 3 at 34.) He also stated that he knew of the raid on Bodybuilding.com on the same day that it happened in September 2009. (Id.) Likewise, Mr. Mellors testified that J&J ceased

18

for Summary Judgment that, had "the [Plaintiff] [] known there
was an ongoing governmental investigation of RAGE and/or its
ingredients[,] [Plaintiff] in good faith would either not have
issued the Policy **or would not have issued the Policy at the
same premium rate and/or with the same terms and conditions.**"[8]
(Doc. 71 at 21 (emphasis added).) In making such a statement,
Plaintiff has created a triable issue of fact as to whether it
would have affirmatively denied coverage as a result of the
misrepresentations, which would result in a finding of material
misrepresentation sufficient to void the policy, or would have
instead merely issued the policy at a higher premium, which is
insufficient under Texas law to show that the misrepresentation
was material. As a result, Plaintiff's motion for summary
judgment due to misrepresentations in the application must be
denied.

---

selling the banned product after December 2009. (Id. at 35.) Mr.
Mellors also knew that certain ingredients in RAGE were
classified as "prohormones" and that these "prohormones" could
be converted to hormones by the human body and result in
substantial physical side effects. (Id. at 37) Finally, Mr.
Mellors stated that he was aware in November 2008 that the DEA
was investigating three prohormones, including Phera-Plex. (Id.
at 40-41.) These facts indicate that Mr. Mellors, and through him
J&J, was aware that the government had investigated the RAGE
ingredients and determined that they were not appropriate to be
sold to the general public.

[8] Similarly, the Plaintiff States that had "the Insured disclosed
the FDA ban, [Plaintiff] would not have issued the Policy, **or
would not have issued it on the same terms and conditions.**"
(Doc. 71 at 21 (emphasis added).)

D.    Prior Knowledge

Plaintiff next contends that the insured's prior knowledge of the FDA ban and labeling of the RAGE ingredient as an anabolic steroid operates to exclude coverage under the policy. (Doc. 71 at 22.) The application, states that

> no fact incident, circumstance, situation, condition, defect or suspected defect indicating the probability of a claim or action for which coverage may be afforded by the proposed insurance is now known by any person(s) or organization(s) proposed for this insurance other than that which is disclosed in the application. It is agreed by all concerned that if there is knowledge of any such fact, incident, circumstance, situation, condition, defect or suspected defect any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

(Doc. 71, Attach. 14 at 12.) Under both Georgia and Texas law such exclusions are enforceable. C. Ingram Co. v. Phila. Indemn. Ins. Co., 303 Ga. App. 548, 550-51, 694 S.E.2d 181, 184 (2010); Westport Ins. Corp. v. Cotton Schmidt, LLP, 605 F. Supp. 2d 796, 806 (N.D. Tex. 2009). However, Defendants argue that that Mr. Mellors's knowledge was too attenuated to support summary judgment. (Doc. 81 at 29.)

Mr. Mellors admitted that he knew that the FDA had classified Phera-Plex as an anabolic steroid in December 2009. (Id. at 31, 34, 35.) Mr. Mellors also admitted that he understood "RAGE has the same complications and side effects as anabolic steroids, including weight gain, strength gain, acne,

hair loss, gynecomastia, and lowered testosterone levels." (Doc. 71, Attach. 1 at 37; Doc. 82 at 5.) Additionally, J&J ceased producing RAGE in response to this ban. Furthermore, Defendants' admission that Mr. Mellors engaged in certain acts and omissions such as "fail[ing] to take any action to warn purchasers of dangers associated with [RAGE] or recall that product," indicates that Mr. Mellors had knowledge of potential claims.[9] (Doc. 81 at 30.)

However, this Court cannot find that these admissions, as a matter of law, show that Mr. Mellors or the insured had the requisite knowledge to trigger the exclusion. While this evidence shows that Mr. Mellors knew that the continued production of RAGE was illegal under the regulatory scheme and that there was the possibility for harm as a result of using the product, it does not show knowledge of Mr. Herren's stroke, the probability of a RAGE related stroke, or the likelihood of a lawsuit. As a result, Plaintiff's Motion for Summary Judgment because of prior knowledge is denied.

E.    Exclusion for Liability Assumed in a Contract

Plaintiff next argues that the policy excludes from coverage claims for bodily injury that the insured is required

---

[9] Mr. Mellors incorporated and adopted by reference, in toto, Defendants Joey Herren and Sharon Herren's Brief in Opposition to Plaintiff's Motion for Summary Judgment. (Doc. 84 at 1-2.)

to pay due to an assumption of liability. (Doc. 71 at 23.) The
policy states that,

> any Claim based upon or arising out of Bodily Injury
> or Property Damage for which the Insured is obligated
> to pay Damages because of the assumption of liability
> in any contract or agreement [are excluded from
> coverage]; provided, however, this exclusion shall not
> apply to liability for damages: (i) that the Insured
> would have in the absence of the contract or
> agreement; or (ii) assumed in a contract or agreement
> that is an Insured Contract, provided, the Bodily
> Injury and Property Damage occurs subsequent to the
> execution of the Insured Contract.

(Doc. 71, Attach. 14 at 32.) The policy defines an insured
contract as "that part of any other contract or agreement
pertaining to the Named Insured's business under which the Named
Insured assumes the tort liability of another party to pay for
Bodily Injury or Property Damage to a third party." (Id. at 30.)

While there is some confusion, the facts alleged in
Plaintiff's Motion for Summary Judgment include that Barrin
blended the Rage ingested by Herren. (Doc. 71 at 23.) The
insured purchased Barrin's assets and assumed its liabilities.
(Id. at 23.) The Purchase Agreement may be considered an
"Insured Contract" as to the insured, as the insured assumed
Barrin's liability in that contract. (Id. at 24.) Mr. Mellors
did not personally assume liability for Barrin's tort liability,
but signed on behalf of SWE. (Id. at 24.) Defendants argue that
because Mr. Mellors entered into the contract individually as a

buyer, he undertook the liability personally and should thus be covered. (Doc. 81 at 30.)

As noted above, "[w]hen a contract is unambiguous and capable of only one reasonable interpretation, it is a matter for the court." Roland, 265 Ga. at 777, 462 S.E.2d at 625. However, "where two or more constructions are possible, even if they are logical, the contract is ambiguous and must be construed against the insurer." Lunceford v. Peachtree Cas. Ins. Co., 230 Ga. App. 4, 7, 495 S.E.2d 88, 91 (1997) (citing Greenwood Cemetery, Inc. v. Travelers Indem. Co., 238 Ga. 313, 316, 232 S.E.2d 910, 913 (1977)).

In this Court's opinion a plain reading of the policy states that in order for an "insured contract" to exist, the "Named Insured" must assume liability. (Doc. 71, Attach. 14 at 30.) The "Named Insured" under the Policy is "June & Johnny, LLC DBA: SWE MD Ment, MEN Technologies." (Id. at 14.) Here, it appears evident from an examination of the Purchase Agreement that Mr. Mellors signed individually[10] as "owner of SWE." Thus, the Purchase Agreement cannot be an "insured contract" because the "Named Insured" did not assume liability.

---

[10] Defendants allege that there was a subsequent agreement that was made between J&J and Barrin, that Mr. Mellors' wife signed at his request. (Doc. 71, Attach. 3 at 23-24.) However, that document has not been entered into evidence.

However, this is not what either party argued. Plaintiff contends that the named insured assumed liability and the terms of the exclusion require Mr. Mellors to personally assume liability in order for the exclusion to apply. (Doc. 88 at 28.) In response, Defendants maintain that because Mr. Mellors did personally assume liability under the contract and individually signed the agreement, the exclusion does not apply. (Doc. 81 at 30.) Given the confusion created by the parties, their disagreement as to the correct interpretation of the language in the policy, and the questions regarding whether the proffered document is the final version of the contract, this Court determines the provision at issue is ambiguous and must be construed against the insurer. Lunceford, 230 Ga. App. at 7, 495 S.E.2d at 91 (citing Greenwood Cemetery, 238 Ga. at 316, 232 S.E.2d at 913). Thus, the determination of whether that provision allows for recovery depends on whether Mr. Mellors assumed liability individually under the contract. As a question of fact exists as to whether Mr. Mellors signed the document personally, or in the place of J&J, Plaintiff's Motion for Summary Judgment as to this provision is denied.

F.    Punitive Damages

Finally, Plaintiff argues that it is not required to provide coverage for any punitive damages. (Doc. 71 at 24.) The policy limits recovery to damages, which is defined as

> the monetary portion of any judgment, award or
> settlement; provided, however, that Damages shall not
> include: (1) multiplied portions of damages in excess
> of actual damages, including trebling of damages; (2)
> taxes, criminal or civil fines, or penalties imposed
> by law; (3) sanctions; (4) matters which are
> uninsurable under the law pursuant to which this
> policy shall be construed; or (5) the return of or
> restitution of fees, profits or charges for services
> rendered.

(Doc. 71, Attach. 14 at 29.) Plaintiff reasons that because punitive damages are defined as "additional damages" under O.C.G.A. § 51-12-5.1(a), then they are "in excess of actual damages" and should be excluded from coverage. (Doc. 88 at 30.)

As explained above, "where two or more constructions [of an insurance policy] are possible, even if they are logical, the contract is ambiguous and must be construed against the insurer." Lunceford, 230 Ga. App. at 7, 495 S.E.2d at 91 (citing Greenwood Cemetery, 238 Ga. at 316, 232 S.E.2d at 913). Here, Plaintiff's argument might pass muster had the policy excluded only damages "in excess of actual damages." However, the quoted provision is prefaced by "multiplied portions of damages in excess of actual damages." (Doc. 71, Attach. 4 at 29.) An equally plausible interpretation of this provision, therefore, is that it was meant to exclude from coverage statutory damages available in certain actions like violations of the Clayton Antitrust Act, 15 U.S.C. § 15, and Racketeer Influenced and Corrupt Organizations violations, 18 U.S.C. § 1964(c). These

types of damages, while punitive in nature, are not traditional "punitive damages." See Time Warner Entm't. Co. v. Six Flags Over Ga., LLC, 254 Ga. App. 598, 607, 563 S.E.2d 178, 186 (2002) (treating statutory multiple damages and punitive damages as distinct when determining whether punitive damage award violated appellants due process rights). The four remaining provisions of the damages exclusion in the policy fail to support Plaintiff's motion for the same reason. There is no plausible way to read "taxes, criminal or civil fines, or penalties imposed by law; [] sanctions; [] matters which are uninsurable under law pursuant to which the policy shall be construed; or [] the return of or the restitution of fees, profits or charges for services rendered" to mean punitive damages. As a result, Plaintiff's Motion for Summary Judgment as to punitive damages is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 71) is **DENIED**. This case will proceed to trial.

SO ORDERED this 23d day of September 2015.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA